# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
|     Plaintiff : | |
| : | No. 1:21-cv-00134 |
| v. : | |
| : | (Judge Kane) |
| $146,388.97 IN U.S. CURRENCY : | |
| SEIZED FROM PNC BANK ACCT. : | |
| ENDING #2883 I/N/O JIMMY TRAN, : | |
| et al., : | |
|     Defendants : | |

## MEMORANDUM

Before the Court is a motion for default judgment filed by the United States of America ("Plaintiff") concerning this forfeiture in rem action. (Doc. No. 8.) For the reasons that follow, the Court will grant the motion and enter default judgment in favor of Plaintiff.

**I.      BACKGROUND**

Plaintiff commenced this action on January 25, 2021, by filing a Verified Complaint for Forfeiture in rem. (Doc. No. 1.) The Verified Complaint seeks to forfeit and condemn to the use of the United States approximately $201,194.55 in U.S. currency: (1) $146,388.97 seized from PNC Bank Acct. Ending #2883 I/N/O Jimmy Tran; (2) $6,690.84 seized from PNC Bank Acct. ending #8784 I/N/O Jimmy Tran; (3) $968.05 seized from PNC Bank Acct. ending #0518 I/N/O Jimmy Tran; (4) $42,529.00 seized from 2400 Forest Lane, Harrisburg, PA; and (5) $4,617.69 seized from 325 S. 17th St., Harrisburg, PA (collectively, the "Currency Defendants"). (Id. ¶ 2.) The currency was seized pursuant to an investigation into the "Food Stamp Fraud, Wire Fraud, and Money Laundering activities of Jimmy Cong Tran, Duyen Nguyen, Luong Cong Tran, and Bach Thi Bui." (Id. ¶ 10.)

The allegations in the Verified Complaint are based on information and belief, the

"source of which is Michael Mocadlo, Special Agent with the Federal Bureau of Investigation[.]" (Id.) Asia Market is a small Harrisburg-based food market and convenience store that opened its doors in early 2008. (Id. ¶ 11.) After it opened, Asia Market applied to the United States Department of Agriculture ("USDA") Food and Nutrition Service ("FNS") for participation in the Supplemental Nutrition Assistance Program ("SNAP").[1] (Id.) The application listed Bach Thi Bui ("Bui") as the store's owner. (Id.) In March 2008, the FNS approved Asia Market for participation in SNAP, and a SNAP Electronic Benefits Transfer ("EBT") terminal and related equipment were installed in the store. (Id. ¶ 12.) Asia Market changed owners in June 2013, from Bui to Bui's son, Jimmy Cong Tran ("Tran"). (Id. ¶ 11.) In "his reauthorization application to the FNS, Tran agreed to comply with all statutory and regulatory requirements associated with participation in SNAP"—relevant here, Tran agreed to refrain from "trading cash for food stamp benefits." (Id. ¶ 12 (internal quotation marks omitted).)

From July 2018 through March 2019, the USDA Office of Inspector General ("OIG") received "three anonymous tips indicating that the owner or manager of Asia Market was purchasing food stamp benefits from customers and exchanging $.50 cash for every $1.00 of SNAP benefits." (Id. ¶ 13.) From March 2018 through July 2020, the OIG conducted numerous undercover purchases at Asia Market using "Confidential Human Sources." (Id. ¶ 14.) "On each of these occasions, either Tran or his wife, Duyen Nguyen ['Nyuyen'], conducted the exchange and provided approximately $.50 for every $1.00 in SNAP benefits provided to Asia Market."

---

[1] SNAP "is a federally funded, state-administered program that distributes monthly benefits, or 'allotments,' to eligible households," which "can use those allotments to purchase food from retail food stores.'" See Hall v. United States Dep't of Agric., 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2013(a)).

2

(Id.) The investigation further revealed that, between January 2016 and April 2020, Asia Market received about $4.2 million in SNAP benefits while "spen[ding] approximately $2.2 million on inventory." (Id. ¶ 15.) Of "Asia Market's April 2020 SNAP transactions, 623 were over $100; 277 were over $150; and 135 were over $200, while the average transaction amounts for a convenience store, small grocery store and medium grocery store are $9.83, $11.09 and $33.08 respectively." (Id.)

Asia Market maintained two PNC Bank accounts, numbered 51-1267-2883 ("Account 2883") and 50-0528-0518 ("Account 0518"). (Id. ¶ 16.) Tran has been an authorized signer on Account 2883 since December 2009, and Nguyen has been an authorized signer on the same account since August 2010. (Id. ¶¶ 16-17.) Account 2883—which was "used as an operating account for both Asia Market and for the personal use of Tran and Nguyen"—had a total of about "$5.3 million in credits/deposits, the single largest source of which was from SNAP, totaling $4.2 million." (Id. ¶ 18 (noting that "[a]pproximately 79% of all credits/deposits in this account came from SNAP").) The largest "debts/withdrawals" from Account 2883 "were cash and totaled approximately $1.466 million," often by ATM withdrawals but also through withdrawals "in branch offices and cashing of checks." (Id. ¶ 19.) On many occasions, "multiple cash withdrawals were conducted on the same day in amounts under the required reporting requirements of $10,000, suggesting an attempt to structure withdrawals to avoid the filing of Currency Transaction Reports."[2] (Id.) Account 0518, on which Tran is the only authorized signer, was "used almost exclusively to account for transactions" for "a provider of

---

[2] "Financial institutions are required to file with the federal government currency transaction reports for cash transactions in excess of $10,000." See Larios v. Mooney, No. 16-cv-873, 2017 WL 1370771, at *2 (E.D. Pa. Mar. 27, 2017) (citing 31 U.S.C. § 5324), report and recommendation adopted, No. 16-cv-0873, 2017 WL 1355409 (E.D. Pa. Apr. 13, 2017).

pre-paid phone cards and long-distance services." (Id. ¶ 20.) Account 0518 reflects "a total of $104,610 in credits/deposits, of which $103,738 constituted transfers from [Account 2883]," and "a total of $104,471 in debits/withdrawals, which included $101,467 paid to a third-party vendor, $1,650 cash withdrawal, and $640 transferred to [Account 2883]." (Id. ¶¶ 21-22.)

Hoa Dong Market is also a small Harrisburg-based food market that applied to the FNS for participation in SNAP, listing Bui as its owner, following its opening in April 2012. (Id. ¶ 23.) In May 2012, the FNS approved Hoa Dong Market for participation in SNAP, and a SNAP EBT terminal and related equipment were installed in the store. (Id. ¶ 24.) In her "authorization application to [the] [FNS], Bui agreed to comply with all statutory and regulatory requirements associated with participation in SNAP," including the requirement that she refrain from trading cash for food stamp benefits. (Id. (internal quotation marks omitted).) From March 2018 through July 2020, the OIG "conducted several undercover purchases at Hoa Dong Market," and on each such occasion, Bui "conducted an exchange and provided approximately $.50 for every $1.00 in SNAP benefits . . . ." (Id. ¶ 25.) From January 2016 through April 2020, Hoa Dong Market "received approximately $893,620 in SNAP benefits" and "spent approximately only $211,450 on inventory." (Id. ¶ 26.) In April 2020, "Hoa Dong Market processed approximately 346 individual SNAP transactions for a total amount of $35,740.47, with an average transaction amount of $105.11"—"[o]f those transactions, 138 were over $100; 79 were over $150; and 32 were over $200." (Id. ¶ 27.) Hoa Dong Market maintained a single PNC Bank account, numbered 51-1330-8784 ("Account 8784") and held "in the name of Jimmy C. Tran DBA Tran's Hoa Dong Market." (Id. ¶ 28.) Tran, Bui, and Defendant Luong Cong Tran were authorized signers on Account 8784 from January 2016 to April 2020. (Id.) Account 8784, which was used as Hoa Dong Market's operating account, had a total of approximately $1.3 million in

credit/deposits, of which 69% came from SNAP, totaling approximately $893,620." (Id. ¶¶ 29-30.) The "second largest source of credits/deposits into [Account 8784] came from [Account 2883]," totaling about $205,364, and "[t]he largest type of debits/withdrawals from [Account 8784] was cash and totaled $808,654, withdrawn through ATM withdrawals and in branch offices." (Id. ¶¶ 31-32.)

Based on the foregoing, Plaintiff asserts that there "is probable cause to believe that the [Currency Defendants] constitute[] property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or any property traceable to such property; or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 or 7 U.S.C. § 2024(b)." (Id. ¶ 33.) The Verified Complaint requests that the Clerk of Court issue a warrant of arrest for the Currency Defendants, that the Currency Defendants "be forfeited to the United States," and that Plaintiff "be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just." (Id. at 12.)

In connection with the filing of its Verified Complaint on January 25, 2021, Plaintiff also filed a Notice of Complaint for Forfeiture with the Court (Doc. No. 2), identifying the applicable procedures for any person asserting an interest in or claim to the Currency Defendants to follow in order to file a verified claim to the Currency Defendants (id.). On February 9, 2021, the Clerk issued a Warrant of Arrest in Rem for the arrest of the Currency Defendants (Doc. No. 3), and the Warrant of Arrest was returned as executed on March 25, 2021 (Doc. No. 4). On August 6, 2021, Plaintiff filed: (1) a Certificate of Service indicating that a copy of the Verified Complaint and Legal Notice were served via certified mail on Jimmy Tran's legal counsel, Richard Hark, Esq., and on Bui, Nguyen, and Luong C. Tran (Doc. No. 6);[3] and (2) a Declaration of Publication

---

[3] The Certificate of Service indicates that the "Preliminary Order of Forfeiture" was served upon

representing that the notice of forfeiture in this case was posted on a government forfeiture website for at least thirty consecutive days, beginning on January 29, 2021 (Doc. No. 7).  After obtaining entry of default from the Clerk of Court (Doc. Nos. 8, 10), on August 17, 2021, Plaintiff filed the instant motion for default judgment (Doc. No. 11), with a proposed Order (Doc. No. 11-1) and supporting brief (Doc. No. 12).

## II.     LEGAL STANDARD

Default judgments are governed by a two-step process set forth under Rule 55 of the Federal Rules of Civil Procedure.  An entry of default by the Clerk of Court under Rule 55(a) is a prerequisite to a later entry of a default judgment under Rule 55(b).  See 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2682 (3d ed. 2007) (noting that, "[p]rior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a)").  Once the Clerk of Court has entered a default, the party seeking the default may then move the court to enter a default judgment under Rule 55(b)(2).  Entry of default does not entitle a claimant to default judgment as a matter of right.  See 10 James Wm. Moore et al., Moore's Federal Practice § 55.31 (Matthew Bender ed. 2010).  Indeed, it is well settled that decisions relating to the entry of default judgments are committed to the sound discretion of the district court.  See Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 74 (3d Cir. 1987).

Three factors control the exercise of the district court's discretion in assessing whether default judgment should be granted following the entry of default: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3)

---

Tran's counsel and the other non-represented individuals.  (Doc. No. 6.)  Plaintiff clarifies in its brief in support of the instant motion that the "Preliminary Order of Forfeiture" included the Verified Complaint and Notice of Complaint.  (Doc. No. 12 at 3.)

whether defendant's delay is due to culpable conduct." See Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000) (citing United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir. 1984)). "A finding that default judgment is appropriate, however, is not the end of the inquiry." Martin v. Nat'l Check Recovery Servs., LLC, No. 12-1230, 2016 WL 3670849, at *1 (M.D. Pa. July 11, 2016). Prior to entering a default judgment, the Court must also determine whether the "unchallenged facts constitute a legitimate cause of action." Wright, et al., supra, at § 2688; Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd., 555 F. Supp. 2d 537, 541 (E.D. Pa. 2008) (stating that, "before granting a default judgment, the Court must . . . ascertain whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law" (citations omitted)). In conducting this inquiry, "the well-pleaded, factual allegations of the complaint . . . are accepted as true and treated as though they were established by proof." See E. Elec. Corp. of N.J. v. Shoemaker Const. Co., 652 F. Supp. 2d 599, 605 (E.D. Pa. 2009) (citation omitted). While the Court must accept as true the well-pleaded factual allegations of the complaint, the Court need not accept the moving party's factual allegations or legal conclusions relating to the amount of damages. See Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990).

**III.   DISCUSSION**

Having reviewed the record, including Plaintiff's Verified Complaint, motion, supporting brief, exhibits, and submissions, the Court finds that the entry of default judgment against the Currency Defendants and in favor of Plaintiff is appropriate. As an initial matter, the Court observes that Plaintiff's unchallenged allegations in the Verified Complaint, taken as true, state a legitimate forfeiture in rem cause of action. The Civil Asset Forfeiture Reform Act, 18 U.S.C. § 981 et seq., authorizes the United States to effect civil forfeiture of certain property, including, as

relevant here: (1) any "property . . . involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956] . . . , or any property traceable to such property";[4] or (2) any "property . . . which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."  See 18 U.S.C. § 981(a)(1)(A), (C).  Section 1956(c)(7) of Title 18 defines "specified unlawful activity" as, inter alia: (1) "any act or activity constituting an offense listed [18 U.S.C. § 1961(1)]," including 18 U.S.C. § 1343 (relating to wire fraud); and (2) any "felony violation of section 15 of the Food and Nutrition Act of 2008 [i.e., 7 U.S.C. § 2024] (relating to [SNAP] benefits fraud) involving a quantity of benefits having a value of not less than $5,000 . . . ."  See 18 U.S.C. § 1956(c)(7)(A), (D).  "[M]oneys . . . furnished by any person in exchange for benefits" in violation of § 2024 are "subject to forfeiture and denial of property rights . . . ."  See 7 U.S.C. § 2024(e).

    Here, the allegations in the Verified Complaint establish that the Currency Defendants constitute property, or any property traceable to such property, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, and also constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 or 7 U.S.C. § 2024(b), the quantity of benefit transactions at issue being more than $5,000.  See 18 U.S.C. § 981(a)(1)(A), (C).

---

[4] Section 1956 ("[l]aundering of monetary instruments") imposes penalties based on a range of conduct, including the following: (1) conducting or attempting to conduct a financial transaction involving the proceeds of specified unlawful activity "with the intent to promote the carrying on of specified unlawful activity"; and (2) conducting or attempting to conduct a "financial transaction  involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity," with the intent to "promote the carrying on of specified unlawful activity," to "conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity," or to "avoid a transaction reporting requirement under State or Federal law."  See 18 U.S.C. § 1956(a)(1)(A)(i), (a)(3)(A), (C).

8

Moreover, Plaintiff has satisfied the procedural requirements provided in Supplemental Rule G of the Federal Rules of Civil Procedure, which "governs a forfeiture action in rem arising from a federal statute." See Fed. R. Civ. P. Supp. Rule G.  The Verified Complaint states: (1) the basis for jurisdiction over the Currency Defendants; (2) the basis for venue; (3) a description of the Currency Defendants "with reasonably particularity"; (4) the location of the Currency Defendants "when any seizure occurred"; (5) the statutes "under which th[is] forfeiture action [wa]s brought"; and (6) "sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial." See id. at G(2).  Further, an arrest warrant was issued, notice was sent to all individuals with an interest in the Currency Defendants, and notification of forfeiture was published for thirty consecutive days on a government website.  See id. at G(3)-(4).  None of the individuals served with notice filed a claim to the Currency Defendants or otherwise answered or defended against the Verified Complaint.  (Doc. No. 8-1 ¶ 2.)

Plaintiff has also offered support for its claim of sums certain of $146,388.97, $6,690.84, $968.05, $42,529,[5] $4,617.69 (totaling $201,194.55) in its Verified Complaint, Affidavit in Support of Default, and other submissions.  In this regard, a critical inquiry is whether these sums constituting the Currency Defendants are "traceable" to unlawful activity—and, notably, the term "proceeds" in 18 U.S.C. § 981(a)(1), in the context of "unlawful activities," is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net

---

[5] The docket for this action reflects this particular Currency Defendant as "$42,5298 in U.S. Currency Seized from 2400 Forest Lane, Harrisburg, PA."  The Court will therefore direct the Clerk of Court to amend the caption to reflect "$42,529 in U.S. Currency Seized from 2400 Forest Lane, Harrisburg, PA" as the proper name of this Currency Defendant.  (Doc. No. 1 at 1, 2 ¶ 2(d).)

9

gain or profit realized from the offense." See 18 U.S.C. § 981(a)(2)(A) (emphasis added).  Thus, "[w]hether or not [any of the interested parties] shared the cash [] received from the government with the food stamp beneficiar[ies], the entire loss amount paid by the government" constitutes "proceeds" because that amount was "diverted from its intended purpose." See United States v. Uddin, 551 F.3d 176, 181 (2d Cir. 2009) (noting that such "'proceeds' are not limited to net profits from the crime," and that "any proceeds directly traceable to food stamp fraud are subject to forfeiture . . ."); see also United States v. Real Prop. at 7401-7403 S. Racine Ave., Chicago, Ill., No. 04 C 5885, 2010 WL 1286885, at *8 (N.D. Ill. Mar. 30, 2010) (stating that "all benefits received as a result of food stamp fraud are forfeitable, not just the ill-gotten profits above the cash amounts paid to the food stamp beneficiaries").

    In determining whether property or proceeds are traceable to food stamp fraud, courts have compared the amount of fraudulently obtained funds to the average dollar amount of food stamp redemptions at similar stores.  See, e.g., United States v. Sufi, 455 F. App'x 672, 676 (6th Cir. 2012).  It is sufficient if the amount of traceable funds is reasonably based on that average.  See id.  Nevertheless, "[t]he Government is only entitled to the portion of the property that was purchased with proceeds of unlawful activity."  See id. (citing United States v. One 1980 Rolls Royce, 905 F.2d 89 (5th Cir. 1990)).  As an illustration, if it is shown that there are "suspicious circumstances surrounding [a vast majority of [$]100-plus [food stamp] transactions"—and $100 far exceeds the average amount of food stamp redemptions/transactions at comparably sized stores—then the total amount of $100-plus transactions can be used as the basis for calculating the property or proceeds subject to forfeiture.  See id. at *10; see also Sufi, 455 F. App'x at 675 (affirming the calculation of fraudulently obtained SNAP proceeds based on the "average[] [] monthly redemptions for [] four comparison stores," subtracting the "amount from the [store]'s

[SNAP] redemptions to arrive at an estimate of loss").

Applying the above authorities to this case, the Court finds that Plaintiff has established that the amounts seized (i.e., the Currency Defendants) are traceable to unlawful activity and therefore subject to forfeiture. As established in the Verified Complaint, the SNAP amounts deposited into the relevant bank accounts are readily traceable to the food stamp fraud operations at Asia Market and Hoa Dong Market. Further, the Currency Defendants seized from the two Harrisburg addresses—one being Asia Market's address (Doc. No. 1 ¶ 2(e)), and the other being the address of Tran's wife, Nguyen (Doc. No. 6 at 6)—are also traceable to the food stamp schemes. As to the specific sums certain represented by the Currency Defendants, in 2020 alone, Asia Market processed 1,035 food stamp transactions in excess of $100 per transaction (for a total of $130,850), and Hoa Dong Market processed 249 transactions in excess of $100 per transaction (for a total of $32,050). The same number of average transactions at a small market (about $10) would have totaled $12,840. The food stamp transactions at Asia Market and Hoa Dong Market therefore exceeded the average amount of transactions at similarly sized markets by about $150,060. Considering that the food stamp scheme took place over several years, the Court finds that Plaintiff has established that the property or proceeds obtained pursuant to the fraudulent food stamp scheme here far exceed the amounts seized (about $201,000 in total) and are therefore subject to forfeiture. In short, Plaintiff has established sums certain based on "a reasonable estimate of loss given the available information . . . ." See Sufi, 455 F. App'x at 676.

Furthermore, the Court finds that the three Chamberlain factors weigh in favor of entering default judgment against the Currency Defendants. See Chamberlain, 210 F.3d at 164. First, Plaintiff will be prejudiced if the Court declines to enter default judgment, as Plaintiff is unable to proceed with this action due to the noticed individuals' failures to respond to the

Verified Complaint and notice thereof and has no other means of obtaining forfeiture of the seized funds.  See Broad. Music, Inc. v. Kujo Long, LLC, No. 14-cv-449, 2014 WL 4059711, at *2 (M.D. Pa. Aug. 14, 2014) (stating that "[p]laintiffs will be prejudiced . . . by their current inability to proceed with their action due to [d]efendants' failure to defend").  Second, the noticed, interested individuals have not asserted a meritorious defense to Plaintiff's claims through the filing of a claim to the Currency Defendants or an answer or other response to the Verified Complaint, or through the filing of a response to the instant motion.  Consequently, the Court is unable to conclude from the interested individuals' silence that they have any defense to the Verified Complaint's allegations.  See Laborers Local Union 158 v. Fred Shaffer Concrete, No.10-cv-1524, 2011 WL 1397107, at *2 (M.D. Pa. Apr. 13, 2011).  Third, the Court cannot discern from the record any excuse or justification for the default apart from each noticed individuals' own culpability.  "A defendant's default, or its decision not to defend against allegations in a complaint, may be grounds for concluding that the defendant's actions are willful."  Innovative Office Prods., Inc. v. Amazon.com, Inc., No. 10-cv-4487, 2012 WL 1466512, at *3 (E.D. Pa. Apr. 26, 2012).  In the absence of an excuse or justification for the interested parties' failures to participate in this litigation, the Court must conclude that the delay is the result of their culpable conduct.  See Laborers Local Union 158, 2011 WL 1397107, at *2.  Accordingly, the Court is satisfied that the Chamberlain factors counsel in favor of entering default judgment in favor of Plaintiff, and thus, will grant Plaintiff's motion for default judgment.

**IV.     CONCLUSION**

Based on the foregoing, the Court will grant Plaintiff's motion for default judgment.

(Doc. No. 12.)[6]  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[6] In its Verified Complaint, Plaintiff seeks an award of "costs and disbursements in this action . . . ." (Doc. No. 1.)  However, in its motion papers and proposed order for default judgment, Plaintiff does not address any such costs and disbursements.  (Doc. Nos. 11, 11-1, 12.)  Plaintiff's proposed order directs that "the United States is entitled to costs herein," (Doc. No. 11-1 at 6 (emphasis added)), but the only sums indicated in Plaintiff's motions, submissions, and proposed order are the Currency Defendants.  Accordingly, the Court does not address Plaintiff's potential entitlement to costs associated with this action.